**AUTOMOTIVE ELECTRIC SERVICE CORP., Plaintiff,**

v.

**ASSOCIATION OF AUTOMOTIVE AFTERMARKET DISTRIBUTORS, Motor Age, Inc. and Motor Age East, Inc., Defendants.**

No. CV 89–4296 (ADS).

United States District Court, E.D. New York.

Sept. 28, 1990.

Lance R. Frank, Cedarhurst, N.Y., for plaintiff.

Bell, Boyd & Lloyd (Victor E. Grimm, Scott M. Mendel, of counsel), Chicago, Ill., for defendant Ass'n of Automotive Aftermarket Distributors.

Hoffinger Friedland Dobrish Bernfeld & Hasen (David B. Bernfeld, Howard A. Gardner, of counsel), New York City, for defendant Motor Age, Inc.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

In this case the plaintiff corporation, a member of a national trade organization, alleges that the organization terminated its membership as a result of "bad faith" on the part of the organization and a competitor-member. The plaintiff seeks to be reinstated as a member, among other remedies. There is one crucial issue before the Court: Has the plaintiff established that the trade organization acted in "bad faith" in termi-

nating the plaintiff's membership so that judicial intervention is appropriate?

## BACKGROUND

The plaintiff Automotive Electric Service, Corp. ("the plaintiff") is a warehouse distributor of automotive parts. This type of business purchases automotive parts from manufacturers and other suppliers, stores the parts in a warehouse and sells the parts to jobbers—mostly retail automotive parts stores and installers. This business is also referred to as an "automotive after market parts business".

The plaintiff is a close corporation owned by the Judelson family for over seventy years, which employs more than fifty persons and has its main office and warehouse in Woodside, Queens, New York. The plaintiff has approximately 400 accounts and its sales volume in 1989 was approximately $7,000,000. Its geographic territories are Queens, Brooklyn, Bronx, Manhattan, Westchester, Nassau and Suffolk Counties.

In November 1984, the plaintiff became a member of the defendant Association of Automotive Aftermarket Distributors ("AAAD" or "the Association"), a national trade organization of warehouse distributors. AAAD is an Illinois not-for-profit organization with its primary place of business in Memphis, Tennessee. There are a number of similar trade associations in the warehouse distributor industry. AAAD offers to its members volume discount purchasing and a national account merchandising program involving the supply of Goodyear Tire and Rubber Company ("Goodyear") company-owned retail automotive parts stores ("GASC stores" or "company-owed stores"). Although AAAD has been trying to develop several other national account programs, at the time of the relevant occurrences in this case, it had only one such viable national account, the Goodyear account. Under a contract with Goodyear, members of AAAD are principal providers of the Goodyear company-owned (GASC) stores.

AAAD is governed by a set of by-laws, an Executive Committee and a President.

A principal feature of AAAD is their "Parts Plus" program. In the program, the members of AAAD attempt to persuade their jobbers to be Parts Plus jobbers, and operate their stores under the "Parts Plus" logo. AAAD employs the services of Marketing Resources, Inc. ("MRI"), an advertising and marketing agency. The members of AAAD are expected to use their best efforts to implement the Parts Plus program by advertising and active solicitation of Parts Plus jobbers with the object of developing a strong network of Parts Plus members. In August 1986, the membership unanimously adopted certain "Standards of Performance" including a requirement that each member had to vigorously promote and implement the Parts Plus program.

AAAD has thirty-five members of whom twenty-two do less than ten million dollars in sales and nineteen are smaller than the plaintiff. Each member has one vote irrespective of size. The largest member in AAAD is a firm called Parts, Inc., whose business comprises approximately 35% of the total sales of all AAAD members. The Executive Committee is made up of its officers and three members. Despite their membership in this trade organization, the AAAD by-laws do not grant any members exclusive territories or preclude any member from competing with other members in any territory.

Among the provisions in the AAAD by-laws and crucial to the determination to terminate the plaintiff, is the following provision set forth in paragraph 11 of the AAAD by-laws (Plaintiff's Exhibit 5), which permits termination of a member:

"... if, in the opinion of the Executive Committee, a Member demonstrates a lack of sincere intent to be a bona fide, active and participating Member of the Association, or to commit to duly adopted Association programs or objectives...."

AAAD contends that the plaintiff failed to meet the requirements of its Parts Plus program and, during the period 1987 through 1989, despite warnings and meetings, failed to improve its Parts Plus program. On November 16, 1989, the Execu-

tive Committee of AAAD voted to terminate the plaintiff's membership, which, of necessity, would mean that the plaintiff would no longer be permitted to sell to the Goodyear GASC stores under its contract with AAAD. As a result of the involuntary termination of its membership in AAAD, the plaintiff commenced this lawsuit.

In essence, the plaintiff contends in this action that it is the victim of a conspiracy to improperly terminate its membership in AAAD so that a larger and newer member, Motor Age, Inc. ("Motor Age") could take over the plaintiff's valuable Goodyear company-owned stores. This was accomplished, according to the plaintiff, by secret agreements, misrepresentations and a breach of the fiduciary duties and contractual obligations set forth in the by-laws.

The plaintiff further contends that its termination was part of an overall plan by which the larger members would advance their own interests at the expense of the smaller members, so that AAAD will have a cadre of larger, more financially powerful member companies. The plaintiff contends that it was terminated as a result of a conspiracy between the larger members, who control the Executive Committee and Motor Age, to take over the plaintiff's Goodyear accounts.

The plaintiff further contends that it relies upon the Goodyear accounts and will go out of business if it is forced to give up the Goodyear business as a result of its termination as a member of AAAD. It therefore asserts that it will be irreparably damaged unless the Court prevents AAAD from terminating its membership. To that end the plaintiff, among other requests for relief, seeks injunctive relief, reinstatement as a member of AAAD and damages. The complaint contains six causes of action, as follows:

1) Breach of fiduciary relationship;

2) Breach of the membership by-laws;

3) Breach of the agreement between the plaintiff and AAAD specifically as to the Goodyear account;

4) Wrongful interference with the plaintiff's contractual rights;

5) Wrongful interference with the plaintiff's business opportunities; and

6) Violations of the Sherman Act and New York's Donnelly Act.

### PROCEDURAL SETTING

Following termination from AAAD, the plaintiff commenced this action in the Supreme Court of the State of New York, Queens County. At the time that the plaintiff filed in state court, a sweeping *ex parte* temporary restraining order ("TRO") was obtained requiring, *inter alia*, AAAD not to interfere with the plaintiff's membership. On December 22, 1989, the defendants removed this case to this Court pursuant to 28 U.S.C. § 1441 on the grounds of diversity (*see* 28 U.S.C. § 1332). The plaintiff not having requested an extension, the *ex parte* TRO expired on January 1, 1990 (*see* Fed.R.Civ.P. 65(b); *see also Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439–40, 94 S.Ct. 1113, 1124–25, 39 L.Ed.2d 435 [1974]).

On January 25, 1990, after oral argument by all sides, this Court granted a second TRO preventing AAAD from terminating the plaintiff's membership. The parties later stipulated to an extension of this last TRO, waived discovery and proceeded to a hearing on the plaintiff's application for a preliminary injunction. After commencement of the hearing, the parties agreed, and the Court ordered that the motion be converted to a full trial on the merits of the entire case pursuant to Fed. R.Civ.P. 65(a)(2). In the interim, the defendants moved to vacate the TRO on the grounds that it had expired by its own terms, or, in any event, by operation of law. On February 23, 1990, the Court denied that application and instead granted a temporary or interim injunction preventing AAAD from terminating the plaintiff's membership for the pendency of the trial. Thus, the plaintiff has at all times until the present continued as a member of AAAD and, as such, continued to service its Goodyear company-owned stores.

## THE TRIAL AND FINDINGS

Since the determinations in this case are, of necessity, factually oriented, the Court is compelled to detail much of the evidence in connection with its findings of fact.

*The Plaintiff's Case:*

GARY W. DAVIS ("Davis") was the President and a shareholder and director of Matthews Auto Electric, Inc. ("Matthews"), a warehouse distributor operating in Oklahoma, Arkansas and Kansas, which was admitted as a member of AAAD in January 1987. The representative of AAAD with regard to recruitment of Matthews was one Joe Matlock, the Executive Vice President of AAAD. Matthews conducted an aggressive "Parts Plus" promotion and succeeded in converting all of their customers to Parts Plus jobbers. The Matthews promotional costs to convert its jobbers into Parts Plus jobbers was approximately $500,000. Six days after the "kick-off" promotional meeting by Matthews to convert jobbers to the Parts Plus program in 1987, Parts, Inc., the largest member of AAAD, purchased the business of Davis' chief competitor. This purchase placed Parts, Inc. directly in the territory of Matthews.

According to Davis, after he vigorously complained to Marvin Almy, the President of AAAD, and Paul Kachapis, the Chairman of the Executive Committee, about the Parts, Inc. intrusion into his territory, the Matthews Company was terminated by AAAD in June 1989 and eventually filed for bankruptcy under Chapter 11 in August 1989. The Matthews firm is still being operated under Chapter 11 procedures.

On cross-examination Davis conceded that the by-laws did not prohibit Parts, Inc. from operating in Matthews' territory or from acquiring another warehouse distributor in Matthews' market area. Further, Davis conceded that from December 1988 to June 1989 Matthews made no payments to AAAD for its purchases of auto parts and also stopped paying dues and promoting the Parts Plus program. Also, in May 1989, Matthews received a notice of possible termination from AAAD and declined to contest its termination.

RICHARD JUDELSON is the Vice-President, Director and a shareholder of the plaintiff corporation and was the plaintiff's principal factual witness. Plaintiff's first contact with AAAD was in 1984 when Joe Matlock contacted them and explained the advantages of joining the defendant-association. With regard to the purchases of auto parts, AAAD furnishes a "group sales allowance" ("GSA") which is a discount given to AAAD, which retains 20% of the amount of the discount and returns 80% of the discount to its members. In 1988 the plaintiff received in excess of $100,000 from the GSA plan. These discounts result from better pricing plateaus, group purchases and "entire truckload" prices.

The cost of joining and maintaining a membership in AAAD by the plaintiff included a $17,500 initiation fee and annual dues of $2,000 per year and marketing dues based on a percentage of annual net sales approximating a total of $12,000 per year.

In September 1984, the plaintiff decided to join AAAD and, by October 1984 they were voted in as a member. The plaintiff entered into a written agreement with AAAD with regard to the Goodyear business and plaintiff geared up to serve the Goodyear company-owned stores in their geographical territory. This process involved revising its computer program, purchasing an initial inventory, and adding a night crew to execute Goodyear orders and deliveries.

The plaintiff started its Parts Plus program in the summer of 1985 on advice from Alan Hunsaker, then a Vice-President of MRI. In 1985 the plaintiff's first Parts Plus program was printed and prepared by Hunsaker. Other plans or amendments were prepared annually with the assistance and advice of Hunsaker. The plaintiff arranged dinner meetings for its jobbers in the fall of 1986 to promote the program and within days fifteen customers agreed to enter the program.

According to Richard Judelson, in the summer of 1987, the plaintiff was advised

that their Parts Plus program didn't receive sufficient customer support and Hunsaker recommended that the program be put "on hold" in order to regroup.

At about the same time, the plaintiff got word of a prospective new member of AAAD, the defendant Motor Age, Inc. ("Motor Age"), a warehouse distributor competitor of the plaintiff which sold in plaintiff's territory. Apparently Motor Age was negotiating to purchase another AAAD member named Forshay–Gabriel, a warehouse distributor in Newark, New Jersey. The plaintiff strongly objected to membership by its competitor and so advised Matlock. Although Richard Judelson was told by President Almy in November 1987 that no Motor Age membership application was pending, two days later the plaintiff received a Motor Age application, dated November 18, 1987 and a ballot including a profile from Motor Age that was dated September 8, 1987. The application contained a statement by Almy and Kachapis, which reads, in part, as follows:

"The application of this member was discussed with the AAAD Executive Committee prior to submission to the membership. We do have existing members in close proximity to Motor Age. It was the consensus of the Executive Committee, however, that we are not at a saturation point in the Metropolitan New York market and that the overall status of the Association would be enhanced by a larger presence in the largest market in the country.

   *     *     *     *     *     *

*Existing national account business would remain with the current members who are serving Goodyear.*

The AAAD Executive Committee and President endorse the application of Motor Age and urge your favorable response on this application" (emphasis supplied).

The ballot itself was placed on the same sheet as a memorandum from Joe Matlock dated November 12, 1987, which stated, in part, as follows:

"Motor Age, should it be accepted, would at once conform to the standards which our members adopted in Montreal last year. They would overnight create a strong Parts Plus presence in a very major autoparts consuming area where we have had no program success to date and so, in the interest of AAAD's increased market share, it is highly recommended that you vote favorably for the admission of Motor Age as a AAAD member."

The plaintiff voted "most strongly" to disapprove the application of Motor Age and contacted all of the members of AAAD and urged them to vote against such admission. On November 26, 1987, Almy called and advised the plaintiff that a meeting would be held on November 30, 1987 with regard to the plaintiff's request to be heard in opposition to the application of Motor Age. Jerry Judelson attended the meeting and, along with several other members, stated their reasons for opposing the Motor Age application. No vote was taken on the first ballot.

By application—memorandum dated December 21, 1987, a second ballot as to Motor Age's admission was circulated to the membership. As with the first ballot, Almy urged the members to vote "yes" on the second ballot. Contrary to prior practice as to the form of the ballots, the second ballot did not contain the option to vote to abstain, despite a request by the plaintiff to include a space to abstain. On January 18, 1988, the plaintiff was advised by Almy that the members approved the Motor Age application for membership.

In April–May 1988 there was a meeting at the plaintiff's office with representatives of the Standards Committee with regard to the Committee's concern about the lack of a viable Parts Plus program by the plaintiff. The Standards Committee advised the plaintiff that it was dissatisfied with the plaintiff's Parts Plus program and gave the plaintiff a deadline of October 1988 to submit a plan and to have a viable program underway by the end of 1988. Thereafter, the plaintiff purchased a Parts Plus sign for its warehouse, answered the telephone "Auto Parts Plus" and placed Parts Plus decals on its trucks, among other efforts.

In addition, Al Schuttinger was made its Parts Plus program manager.

At this time Richard Judelson noticed certain changes in the relationship between the plaintiff and AAAD. Prior to the admission of Motor Age as a member, the plaintiff received approximately six leads from AAAD as to new customers. Subsequent to the admission of Motor Age the plaintiff received no additional leads. Prior to Motor Age's admission the plaintiff was consulted with regard to potential new national account business; that kind of consultation ceased upon the admission of Motor Age.

In addition, in September 1989 the John Deere Co. liquidated a large inventory of auto parts at substantial discounts to AAAD members. Although the plaintiff placed an early order, AAAD unilaterally cancelled the order due to the plaintiff's prospective termination. Since Motor Age was permitted to purchase these discounted products, it gained a competitive advantage. In 1989 there were two instances in which Motor Age purchased certain "Trust" products and plaintiff was not advised of this opportunity. According to Richard Judelson, Motor Age was given a competitive edge over the plaintiff with regard to the two Trust products. Also, Motor Age was provided the opportunity to participate in the new pilot national account program with the Firestone Company, while the plaintiff was denied that right.

In 1989, the Standards Committee initiated a series of steps that culminated in its request to the Executive Committee that plaintiff's membership in AAAD be terminated. A letter was sent by Almy to the plaintiff on April 27, 1989 stating that the Standards Committee recommended that "the termination of membership of Automotive Electric be considered" on the basis of a "lack of sincere intent to be a bona fide, active and participating member". The plaintiff was advised that this matter would be discussed at the Executive Committee meeting of May 23, 1989 to be held at Memphis, Tennessee and that plaintiff's representatives "may be heard at 1:00 p.m. that day." The plaintiff responded in writing and sent representatives to the Memphis Executive Committee meeting.

After an investigation by a delegation of the Standards Committee, the plaintiff received a letter from AAAD dated October 10, 1989 advising it that the matter of plaintiff's termination would be raised again at an Executive Committee meeting at which time plaintiff would be entitled to appear and have an opportunity to be heard. This letter was sent notwithstanding the fact that the plaintiff had, by then, signed up six new Parts Plus stores.

On November 16, 1989 the Executive Committee met, at which time Jerry Judelson and Al Schuttinger appeared and presented the plaintiff's defense to the accusation that it was not properly supporting the Parts Plus program. By letter dated November 17, 1989, plaintiff was notified that "it was the vote of the Committee to terminate the membership of Automotive Electric effective immediately". The letter stated that:

"The grounds for termination were failure to commit to duly adopted Association programs and to demonstrate a sincere intent to be a bona fide, active and participating Member of the Association in that you have failed to establish a genuine and effective Parts Plus program in your marketing area."

As to the prospective results of termination of the plaintiff's membership in AAAD, Richard Judelson testified that the Goodyear business constituted 30% of the plaintiff's annual sales. The plaintiff's sales to Goodyear company-owned stores were as follows:

| 1987 | $2,266,805.80 |
| 1988 | $2,193,582.07 |
| 1989 | $2,152,019.95 |

He also stated that the combination of Goodyear company-owned stores and Trust sales constituted $33\frac{1}{3}\%$ of the plaintiff's gross sales. In addition, the plaintiff made additional changes in its financial structure in order to take on the Goodyear business. It placed a two million dollar mortgage on its warehouse. It entered into an arrangement with Milberg Factors to factor its receivables due to the need for additional

capital created by the extended payment terms granted to Goodyear in its contract with AAAD. As to the impact of the loss of the Goodyear and Trust business as a result of its termination from AAAD membership, Richard Judelson testified that the plaintiff would not be able to pay its bills, its mortgage payments or its factor. In sum, Judelson testified that without the Goodyear and Trust business, plaintiff could not continue to operate as a warehouse distributor.

On cross-examination, Richard Judelson admitted that the plaintiff has no Parts Plus jobbers on Long Island and in Westchester County, even though both areas are significant markets. In 1985 when plaintiff initiated its Parts Plus program, it had 250 active jobbers and, as a result of its initial promotional efforts fifteen were converted to Parts Plus jobbers. Of these fifteen jobbers, fourteen have since dropped out of the program or gone out of business and only one is still a Parts Plus jobber. Judelson conceded that the plaintiff voted for promulgation of the Standards at the August 1986 membership meeting, that he knew that the plaintiff would have to comply with the standards and that the failure to comply with the standards could result in termination of the plaintiff's membership. Significantly, Richard Judelson conceded that in December 1986, prior to the admittance of Motor Age as a member, Hunsaker stated that the credibility of the plaintiff's Parts Plus program suffered because the plaintiff did not deliver the required elements of the program. This was clear evidence of a problem involving the plaintiff's Parts Plus program prior to the admission of Motor Age. Further evidence of this same problem was set forth in the MRI Service Report of January 19, 1987 which summarized a strategic planning meeting held in December 1986, and referred to the plaintiff's Parts Plus program as follows:

"II. *The Parts Plus Program*

The Parts Plus Program has delivered less than the desired results i.e., the jobbers on the program not really supporting Automotive Electric Service or the program.

The overall credibility of the program was mentioned as a concern. This is usually the case if the program deliverables are not delivered or there is a lack of long-range commitment on the part of the warehouse. While every attempt was made to deliver what was promised, the follow through by the jobber or his attitude was not supportive. The commitment was made by the warehouse, but when the support did not come, the commitment of the warehouse began to erode."

By the end of 1986, the number of the plaintiff's Parts Plus jobbers was reduced from fifteen to six. In an evaluation of the plaintiff's Standards and Objectives, dated March 16, 1987, it was stated that the plaintiff's "Parts Plus programs have made little progress in the market. Question management commitment to the program as well as abilities of the company to deliver on the program". In another evaluation of Standards and Objectives dated November 10–11, 1987, all the Parts Plus categories with regard to the plaintiff were answered in the negative including the telling comment that the plaintiff did not actively promote Parts Plus.

Despite warnings in 1988 by AAAD about the need to invigorate their Parts Plus program, the plaintiff did not sign up any jobbers in the program during the year 1988. In fact, the plaintiff agreed to increase its Parts Plus jobbers by the end of 1988 and did not do so even when threatened with termination of membership in AAAD. By the end of 1988 the plaintiff was down to one or two Parts Plus jobbers, a figure less than 1% of its customers. In September 1988, the plaintiff did develop a written Parts Plus Program involving twenty-seven separate elements, which plan was to be implemented prior to the end of 1988. In 1989 some progress was made when plaintiff added a total of six Parts Plus jobbers. In addition, during 1989 the plaintiff participated in another AAAD promotional program by selling seven "Repair America" kits and distributing 2800 "Repair America" booklets.

With regard to the plaintiff's claim of prospective financial ruin if it lost the Goodyear business, it was conceded by Richard Judelson that in 1984, prior to membership in AAAD, it had forty employees and sales of five million, while in 1989 it had fifty-five employees and sales of seven million. He further testified that the plaintiff added a staff to service the Goodyear stores at an annual cost of $200,000 or $30,000 per employee, but admitted that these employees did not work solely on the Goodyear stores. Further, Richard conceded that payment terms on the Goodyear sales were less favorable than other customers in that the Goodyear bills were not paid for an average 125 days. In fact, this late payment plan necessitated the plaintiff's use of a factor. Also, the contract between the plaintiff and AAAD contemplated a non-exclusive right to service the Goodyear company-owned stores, namely, Goodyear could purchase automotive goods from any other warehouse distributor. Also, Judelson conceded that the plaintiff could attempt to sell to the Goodyear stores even if its membership in AAAD was terminated.

In addition, contrary to the plaintiff's contention, the plaintiff's tenure as a member of AAAD does not appear to have been profitable. According to its financial statements, in 1984 the plaintiff had a net profit of $746,000; in 1985 a net profit of $15,000; in 1986 a net profit of $12,000; in 1987 a net loss of $112,000; and in 1988 a net loss of $32,000. Notwithstanding these figures taken from the plaintiff's financial statements, Richard Judelson testified that actually the plaintiff earned a gross profit of $585,000 on the 2.3 million in sales to Goodyear stores in 1987 and also obtains other benefits in purchase discounts of approximately $40,000 per year. Judelson also attempted to explain the substantial difference in the 1984 net profit as opposed to the later years while a member of AAAD, in that the 1984 figures included a net gain to the plaintiff as a result of real estate sold in Connecticut that year, while in 1987 the plaintiff suffered an extraordinary loss of $120,000 when it sold its Connecticut subsidiary. In sum, however, according to the financial statements, the plaintiff had a net operating loss in each of years 1986, 1987, 1988 and 1989.

GILBERT REYES was employed by the plaintiff as a sales representative. On a ruse, in April 1989 he answered a AAAD advertisement in an auto trade magazine which was promoting the Parts Plus program. Reyes filled out a card requesting Parts Plus jobber information giving his location as his home in Rosedale, Queens, New York and sent it to AAAD. He received a letter from AAAD with enclosures stating that the AAAD Parts Plus distributor for Rosedale, Queens was Motor Age.

JERRY JUDELSON is the Secretary, a Director and the majority shareholder of the plaintiff corporation. He testified that by the end of June 1989 the number of plaintiff's Parts Plus jobbers had increased to six. At the final November 16, 1989 Executive Committee meeting, he advised the members of the Executive Committee that his Deere order had been improperly cancelled and that his firm was no longer being given Parts Plus leads. He exhibited photographs of a Motor Age Parts Plus store without a sign and a Motor Age truck without a Parts Plus sign.

On cross-examination, Jerry Judelson conceded that on November 10, 1987 the plaintiff's Parts Plus program was "on hold" and that it continued "on hold" from the summer of 1987 to the fall of 1988; that at the May 1988 Standards Committee meeting he acknowledged that the plaintiff did not have a Parts Plus program in place and he agreed to do so before the end of 1988; that he was told that "termination" was a possible consequence; and that by September 1988 the plaintiff could not implement all of the 27 separate elements in his proposed Parts Plus program.

ROBERT BERKOWICZ is a certified public accountant who has been the accountant for the plaintiff corporation for only one year. He prepared a statement dated February 27, 1990 regarding the impact of the loss of sales of the Goodyear company-owned stores. In this regard, Berkowicz relied on the plaintiff's books and records. He did no audit nor did he

conduct any full-fledged accounting review of the plaintiff's records. Berkowicz testified that, in his opinion, the plaintiff earned a gross profit (from sales less cost of goods) of 29% before operating and fixed expenses. Further, it was his opinion that if the plaintiff lost the Goodyear account, it could not pay its current expenses. Therefore, in that event, he would recommend that plaintiff's officers close down the business and go into bankruptcy.

The Court does not credit the testimony of the plaintiff's accountant. He performed no audit of the plaintiff's financial records; no books and records were produced; no financial statements were prepared for 1989; he has no other clients in the auto parts industry; he omitted key operating expenses such as delivery expenses; he assumed that the Goodyear business would not be replaced; he reviewed no original records; his calculation of the gross profit figures of $357,000 in 1988 and $300,000 in 1989 were contrary to the credible evidence; his report was based on assumptions and figures given to him by Richard Judelson; he accepted the "word" of Richard Judelson in arriving at the 29% gross profit figure; he admitted the 29% gross profit figure was an "educated guess"; he failed to calculate the substantial interest charges involved in factoring the Goodyear accounts receivable; and his covering letter states that "management's assumptions are not necessarily true".

The Court finds that the conclusions stated by Berkowicz were speculative and unsupported by the credible evidence. Indeed, in view of the net operating losses sustained by the plaintiff in 1987 ($25,000) and in 1988 ($94,000), his testimony is unworthy of belief.

HORACE MARVIN ALMY, also known as MARVIN ALMY, has been the President of the defendant AAAD since August 1, 1985. The total annual sales of AAAD members is approximately 640 million dollars per year. The plaintiff corporation had sales of seven million in 1988 and the defendant Motor Age, the second largest AAAD member, had sales of forty million.

During the past years, Almy conceded that some larger members have purchased smaller members. In fact, three of the seven present members of the Executive Committee acquired other AAAD members. Almy stated that one of the goals of AAAD was to bring in one of the largest warehouses in each target area.

Almy testified that Joe Matlock retired on January 31, 1990 as the Executive Vice-President of AAAD. During his employment with the defendant Association, Matlock's two main duties were the solicitation of new members and the development of the Parts Plus program. In connection with his solicitation duties, he recruited both the plaintiff and Motor Age as Association members. It is significant that Matlock was an authorized representative of AAAD for the purpose of procuring new Association members.

Almy testified that the Goodyear company-owned stores were not available to Motor Age when it became a new member, and that there was no agreement with Motor Age or Paul Lehr, its President, for it to obtain the plaintiff's Goodyear accounts. Almy further testified that no such agreement was made by him, Matlock, or with anyone else at AAAD.

After the first "application" and ballot was mailed to the Association members on November 18, 1987, because of concerns raised by the plaintiff and others, the Executive Committee decided to terminate the ballot and investigate further. A second application and ballot was sent out on December 21, 1987. The ballot stated that each member should vote and return the ballot by January 15, 1988. Almy stated that the second balloting resulted in 29 affirmative votes and that only 26 were needed for an affirmative admission vote. On January 18, 1988 Almy advised the members of the results of the balloting—that Motor Age had been voted in as a member of AAAD.

Almy interpreted the crucial ¶ 11 of the by-laws as requiring a commitment on the part of members to successfully participate in the Parts Plus program. He stated that successful participation means "results",

not merely good intentions. Almy did not believe that New York City was a difficult Parts Plus program market; certainly no more difficult than other urban areas where Parts Plus programs had greater success.

The by-laws of the Association provide that the members financial information shall be confidential, as follows:

"ARTICLE VII—MEMBER FINANCIAL INFORMATION

*Section 1.* It shall be the obligation of each Member, within ninety (90) days after the end of its fiscal year, to submit to the Association copies of its balance sheet and statement of income as of the end of and for such fiscal year, *for confidential review by the President,* and to submit available interim financial information within ten (10) days after requested to do so by the President.

\* \* \* \* \* \*

*Section 4.* Members shall not have access to specific financial information submitted by other Members or prospective Members unless Member or prospective Member approves such access ... that he considers essential in making such determination" (emphasis supplied).

With respect to a "working together—winning together" contest to obtain new Parts Plus jobbers in which the plaintiff was assigned a goal of one, the plaintiff's performance was fifth or sixth out of thirty-nine members. During this "contest", the plaintiff obtained two new Parts Plus jobbers when its assigned goal was only one and then had a total of six Parts Plus jobbers. Motor Age had a goal of eight jobbers and obtained none.

In April 1989, the first letter of termination was sent to the plaintiff. A meeting of the Executive Committee was held in May, 1989 and the plaintiff was afforded an opportunity to be heard. The Executive Committee tabled the Standards Committee recommendation to terminate the plaintiff's membership and sent out two representatives to make an inspection of the plaintiff's Parts Plus jobbers. The two representatives were Carl Molin, the Chairman of the Standards Committee, who had al-

ready recommended termination, and Joe Matlock, who, the Court later learned, was not impartial, and had already allegedly entered into a surreptitious agreement to obtain the plaintiff's Goodyear stores for Motor Age. The plaintiff was not afforded an opportunity to accompany the subcommittee members on their investigating rounds, nor was it given an opportunity to provide the subcommittee with a list of its new Parts Plus jobbers, nor was plaintiff provided with a copy of their report.

At the November 16, 1989 Executive Committee meeting at which a vote was taken to terminate the plaintiff's membership, after the plaintiff's representatives were heard and left the meeting, present at the meeting when the termination vote was taken were Marvin Almy and Joe Matlock. Not only did Matlock attend this final Executive Committee meeting but he alone reported to the Executive Committee the negative results of the investigation of the plaintiff's Parts Plus jobbers, which was directly followed by the vote to expel the plaintiff.

One day after the termination vote was taken, on November 17, 1989, letters were sent to the plaintiff, to all suppliers and manufacturers and to Goodyear, that the plaintiff was no longer participating in AAAD projects. At this point, by reason of the plaintiff's termination, Motor Age would have obtained the plaintiff's Goodyear stores.

On cross-examination, Almy emphasized that there were no exclusive geographic areas among AAAD members and that there were overlaps in territorial areas among many of the members including Central California, Dallas–Fort Worth, Birmingham, Chattanooga, Orlando, Albany, Newark and Pittsburgh.

After the first evaluations of the members' Parts Plus programs on March 16, 1987, Almy noted that the plaintiff had made little progress and its management's commitment to the program was questioned. Among the six problem companies to be further observed was the plaintiff. In the second evaluation by the Standards

Committee on November 10–11, 1987, the plaintiff's Parts Plus program continued to rate poorly. In fact, the plaintiff had not even prepared an annual Parts Plus program.

The Standards Committee determined that satisfactory progress had not been made by the plaintiff and a delegation was requested to visit the plaintiff. If there was no improvement, the Standards Committee discussed a recommendation to the Executive Committee for possible termination. No new positive information was ascertained by the delegation and the matter of plaintiff's termination was referred to the Executive Committee. The Executive Committee met on May 23, 1989. The Executive Committee decided to table the question of the plaintiff's termination and to obtain additional information from Matlock, Almy and the AAAD staff.

Thereafter the "fact finding" trip described above was made by Matlock and Carl Molin of the plaintiff's Parts Plus jobbers resulting in an unfavorable report on June 12, 1989. Following this trip, Joe Matlock submitted a report to the Executive Committee and the Standards Committee dated June 7, 1989 and June 12, 1989 (*see* Defendant AAAD Exhibit O), including the following findings:

"Neither Carl nor I saw or heard anything during our investigation of AESC's Brooklyn–Queens jobbers to indicate that satisfactory progress is being made here with Parts Plus no matter who's at fault. The conclusion to be drawn here is that other NY warehouses have been effective, but AESC has experienced four years of failure to achieve Parts Plus objectives in their market."

All the evidence concerning the plaintiff's commitment to the Parts Plus program was not unfavorable. In his evaluation of May 31, 1988, Almy wrote that he believed the plaintiff was dedicated to the Parts Plus program and able to make it work. On October 4, 1988, Hunsaker reported to the Standards Committee that the plaintiff was recommitted and has developed a program. By the end of the second quarter of 1989, the plaintiff had six new

jobbers. At the time of its termination, the plaintiff had a total of seven Parts Plus jobbers, all in New York City, of a potential 1,000 jobbers and had sent out 28,000 flyers in an attempt to obtain additional jobbers.

In addition to the plaintiff, the membership of another member, General Auto Parts Distributors of San Francisco, was terminated in April of 1989. However, this firm was in the process of either going out of business or reorganizing so that the termination was really a "formality". The plaintiff was the only member terminated solely because of a lack of commitment to the Parts Plus program.

PAUL LEHR was one of the two significant witnesses in this case. His testimony on direct examination consists of two different segments. Initially, on direct, Lehr was confident, responsive and believable. Then after he was shown certain "surprise" documents, his composure changed and his testimony became evasive and less credible.

Lehr has been in the automotive aftermarket industry since 1975 and is the President of the defendant Motor Age, Inc., a privately held New Jersey corporation incorporated in October 1980. He prides himself as being a "hands-on" Chief Executive Officer. He and his family jointly own 60% of the Motor Age shares. The defendant Motor Age East, Inc. ("Motor Age East"), was a New York corporation which was a subsidiary of Motor Age, being 80% owned by Motor Age. Motor Age East was merged with Motor Age in June 1989 and is no longer in existence.

Lehr first learned of the defendant Association in 1977 and had contact with it at that time, and, in particular, he discussed some matters with Joe Matlock. In the late 1970s, Lehr was a Vice President of a warehouse distributor known as Parts Group, which filed for Chapter 11 in 1980. Lehr was asked to stay on to oversee the orderly liquidation of the four companies constituting the Parts Group. In October 1980 he formed a new corporation called Motor Age, Inc. and made a successful offer for the assets of the four bankrupt

corporations. He operated Motor Age from its old facility in Hackensack, New Jersey until 1985 when he moved to its present location in Bogota, New Jersey.

Lehr testified that his next contact with AAAD was in the Fall of 1986 when he contacted Matlock and Almy about his possible purchase of Forshay–Gabriel and whether he could then become a member of AAAD. This date of contact between Lehr and Matlock in the Fall of 1986 is significant because it was following this period that plaintiff's Parts Plus problems became a growing concern of AAAD, leading to the plaintiff's ultimate termination.

In January of 1987, Motor Age decided not to purchase Forshay–Gabriel. Eight months later, in July–August 1987, Matlock, Almy and Paul Kachapis, Chairman of the AAAD Executive Committee, visited him. He was given a "sales pitch" to join AAAD. Lehr was told that the New York metropolitan area was the largest market in the United States and that there was room for an additional member, such as Motor Age. He was asked to visit MRI and obtain additional data on AAAD.

In this early testimony by Lehr he stated unequivocally that the AAAD representatives made it very clear that the Goodyear company-owned stores in the Motor Age territory were already allocated to other members and that this arrangement would not be changed. In other words, Lehr clearly testified that in July–August 1987 he was told that if Motor Age became a member, it would not be able to service any of the Goodyear company-owned stores already allocated to the members in his geographical area, including, of course, the plaintiff. In sum, he testified that he was told and knew that if he became a member of AAAD, the Goodyear company-owned stores would remain with the existing members:

"Q Was there any discussion with respect to the potential of Motor Age becoming a supplier to Goodyear stores in connection with prospective AAAD membership?
A Yes. They made it very clear in the conversation that the Goodyear stores were already assigned to—in the territory I serviced, and the Goodyear stores were assigned to four, maybe five distributors depending again upon how you define the market place.

Actually, in terms where I was distributing there were five other members who serviced Goodyear and they made it very clear in no case would any existing supply arrangement between an AAAD member and Goodyear store be modified or changed by virtue if I was to become a member.

\*      \*      \*      \*      \*      \*

Q Was it always very clear it was unavailable to Motor Age and would not be taken from any of the then members of AAAD servicing Goodyear?
A It was always clear there would be no changing in the existing supply match up were Motor Age to become a member. It was not available."

Motor Age decided to apply for membership in AAAD in November 1987 and, in January 1988, became a member. In September 1989, Lehr became a member of the Executive Committee. Other officers of Motor Age are also presently taking an active role in various committees of AAAD.

After admission to membership, Motor Age converted seventy-one or seventy-two jobbers to the Parts Plus program. However, by early 1989, its Parts Plus jobbers were reduced in number to fifty-five to sixty. (Plaintiff's Exhibit 31 shows fifty such jobbers for Motor Age as of September 1989.) Of these Parts Plus jobbers, however, only six were in the five boroughs of the City of New York, further evidence that New York City is a difficult market for the Parts Plus program.

According to Lehr, the first discussion with a representative of AAAD concerning the acquisition by Motor Age of Goodyear company-owned stores was in May 1989 in a telephone call from Almy:

"Q There came a time as you described when you received word from Mr. Almy in approximately May of 1989 regarding the potential of Motor Age servicing Goodyear, is that correct?

A You asked me when was the first time I had a conversation with anyone regarding Goodyear. I said it was a phone call form Mr. Almy in May 1989, that's correct."

At that time, in May 1989, Almy called him with regard to "contingent planning", namely, *if* the plaintiff's membership was terminated would he be interested in servicing the Goodyear company-owned stores and if so, when could he do so. Not surprisingly, Lehr answered "Yes", and that he could do so within thirty to sixty days. In response, Almy said, "Okay, do nothing now, the matter is still under review".

In the summer of 1989, Lehr decided to solicit the independent non-company owned Goodyear stores, which were "fair game" for any member.

According to Lehr, the next Goodyear discussion was at a dinner with Almy in July 1989 when he asked Almy "whether there was anything new on the plaintiff's situation" and Almy said, "No, the matter was still under review".

Lehr testified, with specificity, that when he returned from a Phoenix AAAD meeting on September 26 or 27, 1989 he made a decision to take active steps to take over the plaintiff's Goodyear stores.

On November 16, 1989, the Executive Committee voted to terminate plaintiff's membership. Lehr was not present at this vote. Lehr testified that at that time, he knew for the first time that Motor Age would get the plaintiff's Goodyear stores. Motor Age was poised and ready to serve the plaintiff's Goodyear accounts as of December 17, 1989.

In answer to several pointed questions raised by the plaintiff's trial counsel, Lehr denied that he had any copies or printouts of the plaintiff's GASCs (Goodyear customers) prior to November 1989. In addition, Lehr unequivocally denied that Joe Matlock sent him copies of the plaintiff's sales data prior to 1989.

"Q Did you have that specific information with respect to the plaintiff's GASCs?

A The plaintiff was listed right on the list along with every one else.

Q Did you have that information?

A Not in my possession but I certainly seen it.

Q You had no copies or printouts of it?

A The first time I got a listing in detail of the plaintiff's GASCs I believe was in November or December of 1989 when I was visited by staff.

I don't recall getting the plaintiff's detailed information previously.

Q Is it—and isn't it a fact that prior to the time you even applied to AAAD Joe Matlock sent you copies of information and data pertaining to plaintiff's sales to its GASCs?

A *Joe Matlock did not send me information on the plaintiff's GASC sale.*

Q Isn't it a fact prior to the time you applied for AAAD membership Joe Matlock promised that Motor Age can have the plaintiff's GASCs if it joined AAAD?

A Absolutely not.

Q Prior to the date you applied Joe Matlock sent you a list what the GASCs were an [sic] information on the plaintiff's sale to its GASC which included monthly sales, annual sales, inventory, turnover terms and other information?

A I had that information on Forshay–Gabriel not on Automotive Electric" (emphasis supplied).

At this point in the trial, from a forceful, confident and persuasive witness, Lehr's posture changed and direct evidence of "bad faith" entered the case, tangibly, for the first time:

"Q Let me show you a document and I ask if this is your signature here?

A This is not my signature, no.

Q Is this?

A Yes, that is.

Q Is this Motor Age stationery?

A Yes.

MR. FRANK: I have a copy for you, counsel.

(Whereupon, there was a pause in the proceedings.)

Q Is that your signature?

A Yes.

Q Is that your note, sir?

A This is mine. This is my signature. This is not my signature.

Q This is your signature at a location on this page?

A Yes.

THE COURT: Referring to the right side of the page?

THE WITNESS: Yes.

Q It is on Motor Age letterhead?

A Inter-office stationery.

Q Your signature is below all the typed language on that document, is it not?

A To the right and below.

MR. FRANK: I would move this item into evidence.

THE COURT: Show it to counsel.

MR. FRANK: They have copies now.

MR. GRIMM: *Your Honor, from my point of view I have not seen this document before.* I think it is appropriate to lay a foundation. All he's done is identified his name on one page" (emphasis supplied).

The document shown to Lehr by plaintiff's trial counsel, is the most crucial piece of evidence in this case, and, it was apparent to the Court that Lehr was surprised to see it in the possession of the plaintiff's counsel. Plaintiff's Exhibit 38 is the significant document. The first sheet in Plaintiff's Exhibit 38 is a document entitled "Inter-Office Memo" dated September 10, 1987. The memo includes a typewritten portion and a handwritten part in the right upper border. The typewritten portion is reproduced in its entirety, as follows:

"INTER-OFFICE MEMO
TO: AO          FROM: PPL
CD

SUBJECT: AAAD Info     DATE: September 10, 1987

Attached is data on Goodyear business that Joe promised us. It appears that his 'guess' at Auto Electric's volume was too high, although the Forshay numbers were correct. In total, the Goodyear volume is about $5½ million per year—still not too shabby.

                    Paul (handwritten)
MOTOR
     AGE"

On the upper right-hand side of this memo from "Paul", obviously from Paul

Lehr, dated September 10, 1987, appears the following handwritten note:

"SB—Start 'AAAD' file in my credenza near All Pro file. P."

Plaintiff's Exhibit 38 also includes a AAAD FAX lead sheet, dated September 8, 1987, which is precisely reproduced, as follows:

"FROM     AAAD                9. 8.1987   16:15
                    AA
                    AD

ASSOCIATION OF AUTOMOTIVE
AFTERMARKET DISTRIBUTORS

(AAAD)

FAX NUMBER 901-278-2228

LEAD SHEET
DATE:   9-8-87
TO:      PAUL LEHR
FROM:  JOE MATLOCK
TRANSMITTED BY:  AE
NO. OF PAGES (INCLUDING THIS PAGE):  5

COMMENTS:_____
_____"

Attached to the FAX lead sheet of September 8, 1987 are four pages of figures, including a detailed breakdown of the plaintiff's "Goodyear sales/inventory analysis" for its fourteen Goodyear locations. These figures include the number and amounts of sales and inventory turnover for each of the plaintiff's fourteen Goodyear stores. Another sheet faxed to Lehr lists the "Stores served by Auto Elec." and gives the store number and the location of each store.

The Court takes note of the words by Lehr in the "inter-office memo" of September 10, 1987. "Attached is data on Goodyear business that Joe promised us" and, referring to the Goodyear stores of both the plaintiff and Forshay–Gabriel, "In total, the Goodyear volume is about $5½ million per year—still not too shabby."

To compound Lehr's credibility problem, after having been shown the document containing his handwriting, he denied ever seeing the document:

"MR. FRANK: I will proceed further.

Q Have you seen this document before?

A No.

Q You've never seen this document?

A  I don't recall seeing it.

Q  Have you seen this second page before?

A  No, I have not seen the second page.

\*    \*    \*    \*    \*    \*

Q  Your signature on that addressed with a little note addressed to S B.  Is that Sharon, your secretary?

A  Yes.

Q  Did you write a note: Start AAAD file in my credenza near All Pro file and start this note on that is—

A  What is written above is my handwriting.

Q  Is your handwriting put on the sheet before or after the typed or printed matter?

A  It would appear it was put after it was typed.  But I don't recall writing it on this document.  It is not my handwriting, it is not signed by me as to the memorandum, but the note on the upper right-hand corner is my handwriting.

Q  Isn't it a fact that by this document you boasted to your employees regarding the GASC business that Motor Age was going to get from Forshay–Gabriel and Automotive Electric?

A  I didn't write this memorandum so I didn't do the boasting.  I say this is my handwriting over here.  I did not write the memorandum."

These documents furnish clear and convincing evidence that AAAD sent the confidential Goodyear business of the plaintiff to Motor Age on September 8, 1987 and that Lehr was under the impression, at that time, that Motor Age was, in some manner, to be given the plaintiff's Goodyear accounts.  These documents and Lehr's testimony prior to and subsequent to viewing the documents constitute evidence of "bad faith" on the part of both defendants.

On the stand, Lehr unequivocally denied that there was any agreement between Motor Age and AAAD for Motor Age to become a member and take over the plaintiff's Goodyear accounts.  Lehr further denied that he ever boasted to his employees that such an agreement existed.

At the conclusion of his direct examination, the testimony of Paul Lehr was interrupted and the plaintiff produced the second crucial witness, one TEDDY GARFINKLE, who was employed by Motor Age for five years between August 1983 and November 1988.  After two years Garfinkle was appointed the sales manager of Motor Age.

In 1987 he had conversations with Lehr about Motor Age taking over the Forshay–Gabriel business, and, in particular, its Goodyear stores, because of the high profit margin of the Goodyear business.  Garfinkle testified that he had no conversations with Lehr concerning the plaintiff prior to Motor Age joining AAAD.  However, Garfinkle testified that, after Motor Age became a member of AAAD, Paul Lehr told him about a "deal" in which Motor Age would obtain the Goodyear business from Forshay–Gabriel and the plaintiff, as follows:

"Q  What did Mr. Lehr say?

A  Paul told me he made a deal, it was not on paper, but that eventually we would be getting the Goodyear business that was now owned by Forshay Gabriel and Auto Electric.

Q  Would you know the full name?

A  Auto Electric Service Corp.

\*    \*    \*    \*    \*    \*

Q  Did Mr. Lehr say it was made before or after joining?

A  Made before joining.

Q  Would you please tell me as much as you can about what he said that the deal was?

A  In relation to getting the Goodyear business, okay, the only thing I was told we were promised we would get the Goodyear business."

\*    \*    \*    \*    \*    \*

Q  Were you under some impression, without saying what it was?

A  Yes.

Q  What was the basis of your having this impression?

A  I was told by Paul that we did have a secret deal with AAAD.

Q Please continue with your spring conversation?

A Paul told me AAAD's legal department recommended at that time it wouldn't be a good idea for them to give Motor Age a program. They were waiting to build a case, I guess, against Automotive Electric for poor performance or whatever the standards of AAAD are."

When Garfinkle asked Lehr for an opportunity for him to familiarize himself with the deal, Lehr handed him a file called his "Goodyear file". He personally received these documents from Lehr in the Spring of 1988. In the "Goodyear file" was Plaintiff's Exhibit 38 including the 1987 "interoffice memo" and the financial data on the plaintiff's Goodyear stores.

"Q Did Mr. Lehr at any time give or show you any documents pertaining to Motor Age and Goodyear business?

A Yes.

Q When did he do so?

A I was also anxious and I asked if I can familiarize myself with the Goodyear program knowing we were supposed to get this deal and at that point he gave me a file which he called his Goodyear file.

Q When was that?

A That was the spring of '88.

Q Did Mr. Lehr give you some documents?

A Yes.

Q What did he refer—what did he refer to those document as?

A As his Goodyear file.

Q Did you receive those documents?

A Yes.

Q From whom—what person did you receive the document from?

A From Paul.

Q Now, let me show you what has been marked Plaintiff's Exhibit 38 for identification and please take a moment to look at that and all pages of it.

(Whereupon, there was a pause in the proceedings.)

A I have looked.

Q Do you recognize this document?

A Yes.

Q What do you recognize it to be?

A This is a document that was part of the Goodyear file given to me by Paul."

Plaintiff's Exhibit 41, found in the Motor Age "Goodyear file" is dated November 30, 1986 and apparently constitutes a detailed description of the automotive parts inventory statistics of the plaintiff Automotive Electric Service Corp. The document contains the monthly sales of the plaintiff.

Garfinkle further testified that he was responsible for converting the Motor Age All Pro jobbers to Parts Plus jobbers and for signing up new Parts Plus jobbers. From January 18, 1988 to October 1988 only one All Pro jobber converted to a Parts Plus jobber. Based on his fifteen years of experience in the automotive aftermarket industry, Garfinkle was of the opinion that the Parts Plus program was a "very hard sell" in urban areas, and it was not a real benefit to jobbers in New York City. This evidence supports the plaintiff's contention that New York City is a difficult area to obtain Parts Plus jobbers.

Garfinkle met the Judelsons in about December 1989, and voluntarily disclosed the documentary evidence (Plaintiff's Exhibits 38 through 41) to them about one month later. Questioned on cross-examination by trial counsel for Motor Age, Garfinkle stated that he resigned from Motor Age when his commissions on two occasions were reduced. An argument with Lehr ensued and he stated that Lehr humiliated him in front of the other salesmen. Obviously, his resignation under these circumstances engendered anger on his part toward Lehr and Motor Age. When offered certain benefits by Lehr on condition that he return all papers, he candidly admitted that he accepted the benefits but surreptitiously kept certain documents and ultimately showed them to a competitor of Motor Age. Garfinkle further conceded that he had a minor business relationship with the plaintiff, involving approximately $15,000 in sales.

On cross-examination by counsel for Motor Age, further details surfaced about the alleged "secret agreement" between Lehr and AAAD. In particular Garfield related the substance of a conversation with Lehr

in March–April 1987. At that time Lehr told him he had a secret deal with AAAD to get the Goodyear business. Lehr stated that he no longer needed to purchase Forshay–Gabriel and could put up his own warehouse for Goodyear stores and run Forshay–Gabriel out of business. Lehr further stated that Garfinkle would operate the warehouse for Goodyear business. The plan was for Garfinkle to work one day a week on his old accounts and the other four days on the Goodyear stores.

Garfinkle resigned his position with Motor Age in October 1988; he was not discharged. The cross-examination of Garfinkle did not result in any contradictions or discrepancies. He stuck to his testimony that Lehr had discussed a "secret deal" with him and gave the general terms of the deal. The Court credits the testimony of Garfinkle.

After the completion of Garfinkle's testimony, Paul Lehr resumed the stand. Under "cross-examination" by his own attorney, he reviewed his education (MBAs in finance and accounting) and past employment. Since Motor Age was incorporated in 1980 its sales increased markedly from four million in 1981, fifteen million in 1984, forty million in 1987 to fifty-two million in 1989. He stated that his initial negotiations with Matlock took place in the Fall of 1986 and solely related to the prospective purchase of Forshay–Gabriel. The prospective Forshay–Gabriel purchase negotiations ended just prior to Christmas 1986, and, according to Lehr, that ended his contact with AAAD. Lehr testified that new discussions began in July 1987, when he discussed membership in AAAD with Matlock, Almy and Kachapis. Lehr then admitted that he discussed the Goodyear business at that time and suggested reallocation of the Goodyear business pro rata based on sales. Lehr testified that Matlock laughed at him and said there was no precedent for reassigning Goodyear company-owned stores to incoming members. Then Lehr requested an equal one-third division between the plaintiff, Forshay–Gabriel and Motor Age. He said Matlock was not persuaded but would being the matter before the Executive Committee. It was at

this point, according to Lehr, that Matlock agreed to send him the Goodyear financial figures concerning the stores of the plaintiff and Forshay–Gabriel.

The Court notes that in his original testimony, prior to the appearance of Plaintiff's Exhibit 38 and Garfinkle, Lehr testified unequivocally that the AAAD representative made it clear that the Goodyear stores would remain with the old members and that he could not have any of the Goodyear company-owned stores. In his prior testimony, Lehr stated that the first discussions concerning a possible Motor Age acquisition of the plaintiff's Goodyear stores was in May 1989. After seeing Plaintiff's Exhibit 38 and hearing Garfinkle, Lehr moved up those conversations to July 1987, almost two years earlier. This change in dates is significant. If a 1987 secret agreement did in fact exist between AAAD and Motor Age, and Lehr was being considered to take over plaintiff's Goodyear stores, AAAD had two years to "build a case" against the plaintiff.

The Court further notes that on direct examination nothing was mentioned by Lehr about his receipt of the financial data on plaintiff's Goodyear stores or of the "AAAD file" kept in his credenza. Also, on direct examination, Lehr testified that he didn't recall ever seeing Plaintiff's Exhibit 38 or that it was given to Motor Age prior to its membership in AAAD. This testimony was not true, as Lehr later conceded.

In any event, Lehr ultimately conceded that Matlock did send him the plaintiff's Goodyear data and that the handwritten portion of the "inter-office memo" of September 10, 1987 was his. Lehr also conceded that he gave Garfinkle his "Goodyear file" for several months in 1988. He stated, however, that after Garfinkle returned the file, it did not include Plaintiff's Exhibit 38.

Lehr testified on cross-examination by his counsel, that Matlock called him in September–October 1987 and said that the Executive Committee would not agree to his request for reassignment of the Goodyear

company-owned stores. This was quite a variance from his original testimony that no discussion of the Goodyear stores took place until May 1989, almost two years later.

Getting to the crucial issue, on cross examination, Lehr denied that there was any understanding or agreement between Motor Age and AAAD that Motor Age could get the plaintiff's Goodyear company-owned stores or to cause plaintiff's membership to be terminated and that he never told Garfinkle of such a deal. He further stated that any discussions about Goodyear stores related to the independent stores and not to the company-owned stores. (The Court notes that the figures in Plaintiff's Exhibit 38 concern the plaintiff's Goodyear company-owned stores and not Goodyear independent stores.)

As to Ted Garfinkle's testimony regarding a secret deal to acquire the plaintiff's Goodyear stores, Lehr stated that in January, 1987 he told Garfinkle that he was interested in buying Forshay–Gabriel because of its Goodyear stores. The Goodyear company-owned stores are what attracted Lehr to Forshay–Gabriel.

The Court also notes that while Lehr testified that he asked for only one-third of the 5.5 million dollar Goodyear business, he circulated an inter-office memo on September 10, 1987 referring to the entire volume of "about $5½ million per year—still not too shabby". There was no reference in this memo of only a one-third share. The clear import was that—in some manner—Motor Age was to obtain the entire 5½ million dollar Goodyear business then held by both Forshay–Gabriel and the plaintiff. The means by which Motor Age would obtain the plaintiff's Goodyear business is less clear. As to the Forshay–Gabriel Goodyear accounts; they would be purchased. As to the Automotive Electric Goodyear business; no mention was made at that time as to the manner of acquisition. Ultimately, fortuitously, the plaintiff's membership in AAAD was terminated and its Goodyear business given to Motor Age. Thus, Motor Age's expectations with regard to the plaintiff's Goodyear business, as indicated in its inter-office memorandum of September 10, 1987, came true.

At this point, the plaintiff Automotive Electric Service Corporation rested.

*The Defendants' Case:*

ALAN HUNSAKER was formerly employed by MRI since 1983 and has been employed since January 1990 as Director of Marketing for AAAD. While with MRI one of his responsibilities was to implement the AAAD Parts Plus program. Hunsaker assisted the plaintiff in developing a Parts Plus program. He started with plaintiff in October 1985 with a "kickoff" program in which the plaintiff signed up fifteen jobbers within the first two weeks. From these first fifteen jobbers, the plaintiff let the Parts Plus program slide until they were down to very few jobbers. Then the program was slightly rejuvenated in 1989 when the plaintiff added six jobbers.

The progress of the plaintiff in the Parts Plus program is traced by the various service reports filed by Hunsaker. The service report of January 29, 1986 indicated that greater member commitment was required. Hunsaker testified that in 1986 the plaintiff failed to deliver the elements of the Parts Plus program he had worked out for them. In Hunsaker's January 19, 1987 service report he stated that "the commitment of the warehouse began to erode".

Alan Hunsaker testified in detail to a chronological history of failure on the part of the plaintiff to implement a viable Parts Plus program. He stated that the plaintiff put its Parts Plus program "on hold" in June 1987. Further, he stated that plaintiff delivered no Parts Plus program in 1988. However, in September 1988 a program was finally put together for 1988/1989 which Hunsaker felt would be acceptable, if implemented. The program provided for an initial four Parts Plus jobbers and ten to twelve members by the end of 1989. Instead of increasing their Parts Plus jobbers by December 1988, the members fell from four to three. In sum, Hunsaker was of the opinion that the plaintiff lacked commitment to the Parts Plus program and didn't deliver what it promised.

During cross-examination, Hunsaker conceded that in 1988, the plaintiff erected a Parts Plus sign at its warehouse and placed Parts Plus signs on its trucks. Also as of October 1988, the plaintiff's telephone was answered "Auto—Parts Plus". Further, in the MRI memorandum dated October 4, 1988, Hunsaker rendered a more favorable report as to the plaintiff's Parts Plus efforts, as follows:

"Opinion
I feel that Automotive Electric has recommitted to the delivery to the Part Plus program and has developed a program which it will be possible for them to deliver. Areas where problems occurred previously have been addressed and specific individuals designated as responsible for seeing that those are remedied. The target set by Automotive Electric of the initial four Parts Plus members and targeting a total of ten to twelve by the end of '89 is, in my estimation, a realistic and controllable number.

\* \* \* \* \* \*

Also worth noting is the fact that as I was waiting to see the Judelson's and noticed that the phone was being answered as Automotive Electric Parts Plus. Automotive has also identified their invoices, statements, credit memos, etc. (see attached) which both Parts Plus and Trust logos."

In actuality, by June 1989, the plaintiff had acquired six new jobbers in addition to the one old one and had accomplished half of its target of ten to twelve jobbers with additional time available to the end of 1989. Further, in the April 7, 1989 MRI "Standards Committee Update", Hunsaker stated that the plaintiff, "Has met the guidelines as set forth by the Standards Committee, to a point". One month later, notwithstanding this favorable report by the person directly supervising the plaintiff's Parts Plus program, the Standards Committee recommended plaintiff's termination.

MARK DARNELL MULLER was the President and Chief Executive Officer of Muller Warehouse, Inc. a AAAD member since 1979, operating in the Dallas–Fort Worth area. His firm has approximately fifty-three Parts Plus jobbers. He is a member of the Standards Committee and the Executive Committee.

In the fall of 1987 the Standards Committee focused on five members who were deficient in meeting the standards of the Parts Plus program, including the plaintiff. On-site meetings were scheduled and Muller visited the plaintiff and two other deficient members. Even though the plaintiff was asked to send a representative to the next meeting of the Standards Committee, the plaintiff failed to do so. While one of the five firms went out of business, two of the firms made progress, while the plaintiff and Forshay–Gabriel failed to do so.

In the Spring of 1989, the Standards Committee decided that if the plaintiff did not show more progress it would recommend termination. It was Muller's opinion that after five years and no viable Parts Plus program, it was proper to terminate the plaintiff. Muller conceded, however, that Forshay–Gabriel had no Parts Plus program and was not terminated. Further, he testified that the only visit by AAAD's attorney was to the plaintiff.

PAUL KACHAPIS, the Chairman of the Executive Committee of AAAD, was the final defense witness. He is employed by Alden Warehouse, a AAAD member located in Somerset, Massachusetts. Alden has about forty-eight Parts Plus jobbers. He voted to terminate the plaintiff in order to "raise the standards" of AAAD.

In February 1987, Matlock told him that Motor Age wanted Goodyear business. Kachapis told Matlock that none was available. Also, he stated that he personally told Lehr on three or four occasions that no Goodyear stores were available.

Of importance to this determination, Kachapis testified that the Goodyear company-owned store data was confidential, not available in the industry and would not be divulged to non-members. The Court wonders why then, was the confidential financial data of the plaintiff's Goodyear stores sent to Lehr in September 1987, prior to his becoming a member? Specifically asked

whether he authorized Matlock to give Lehr the financial information concerning the Goodyear stores, prior to Motor Age's membership, Kachapis answered "No". Although Kachapis later said if he was asked he wouldn't have stopped Matlock from supplying this information, the Court does not credit this response.

Both defendants rested.

In rebuttal, the plaintiff produced ALFRED SCHUTTINGER, an employee of the plaintiff for thirty years, an outside salesman and the plaintiff's Parts Plus manager. Schuttinger told the Executive Committee that when Matlock took part in the investigation of plaintiff's jobbers in 1989, he called on the wrong accounts. Also, at the Executive Committee meeting on November 16, 1989, Schuttinger produced letters from the plaintiff's five new Parts Plus jobbers and no Executive Committee member asked to see the letters.

Schuttinger was of the opinion that it was very difficult to sell the Parts Plus program in the New York City area and despite this handicap, the plaintiff signed up six new Parts Plus jobbers in the first six months of 1989. He conceded, however, that the plaintiff had no Parts Plus jobbers in Nassau, Suffolk or Westchester.

All sides rested.

*Additional Findings:*

1. At the outset, the Court finds that the plaintiff has failed to establish any overall plan by AAAD and the larger members to squeeze out smaller members.

2. The plaintiff had no viable Parts Plus program in 1987 and 1988. In fact, the plaintiff's Parts Plus program was "on hold" from the summer of 1987 to the fall of 1988.

3. New York City is a difficult area to obtain Parts Plus jobbers.

4. At least by September 8, 1987, the defendant Motor Age by Paul Lehr, its President, and the defendant AAAD by Joe Matlock, its Executive Vice–President and authorized soliciting representative, entered into an oral agreement, intended to be secret, by the terms of which, in substance, Matlock promised Motor Age that if it became a member, it would obtain the Goodyear company-owned stores then serviced by the plaintiff. As a part of this agreement there was also discussion of the means by which Motor Age would get the plaintiff's Goodyear accounts, including the possible termination of the plaintiff for failing to commit to a viable Parts Plus program.

5. The Court finds the said secret agreement to permit Motor Age to take over plaintiff's Goodyear business was made before Motor Age became a member of AAAD and the prospect of obtaining the plaintiff's Goodyear business was a substantial factor in inducing Motor Age to enter AAAD.

6. On or about September 8, 1987, the same day that Joe Matlock sent Lehr the confidential financial data on the plaintiff's Goodyear business, the defendant Motor Age sent its "profile" to AAAD, preparatory to applying for membership.

7. At or about or shortly after the date of the Motor Age memorandum of September 10, 1987 (Plaintiff's Exhibit 38), the defendant Motor Age applied for admission to AAAD.

8. In a meeting with Marvin Almy in November, 1987, Richard Judelson inquired as to the status of Motor Age and Almy said no discussions were going on. The Court finds that, contrary to such assertions by Almy, discussions must have been going on, since a ballot and "application" was sent out by Almy on November 18, 1987 including a profile from Motor Age dated September 8, 1987.

9. The first Motor Age ballot was mailed on November 18, 1987, and it said that the Dun & Bradstreet report for Motor Age was favorable and the report was on file in the office (important because of the bankruptcy history of the predecessor of Motor Age). In fact, the Dun & Bradstreet report was dated December 11, 1987, three weeks later. Further Almy was aware that Motor Age's predecessor had been in bankruptcy in the late 1970s but did not report that fact to the membership

when he recommended the admission of Motor Age.

10. Evidence of misrepresentation is demonstrated in the applications for membership from Motor Age. The November 18, 1987 "application" (Plaintiff's Exhibit 10) includes the following representation:

"Existing national account business would remain with the current members who are serving Goodyear."

This was a fraudulent misrepresentation since, prior to that time, Lehr and Matlock entered into a secret agreement for Motor Age to take over the plaintiff's Goodyear accounts.

11. The Motor Age application states: "Goodyear (or other national account) considerations—None."

This was a fraudulent misrepresentation since, prior to that time, Lehr had made a secret agreement with Matlock to obtain the plaintiff's Goodyear accounts.

12. The Court finds that there were no "irregularities" in the balloting for Motor Age membership which would require vacating its membership in AAAD.

The Court finds that the election of Motor Age to membership in AAAD was proper, valid and substantially complied with the by-law requirements.

13. The Court finds that the plaintiff had adequate notice and opportunity to be heard at the November 16, 1989 Executive Committee meeting at which time a vote to terminate the plaintiff was passed. Therefore, there was no violation of procedural due process with regard to the plaintiff's termination.

14. Despite Forshay–Gabriel not having any Parts Plus program in place, AAAD never terminated or even threatened to terminate its membership.

## DISCUSSION

The plaintiff's complaint sets forth six causes of action against both AAAD and Motor Age, all of which arise out of the termination of the plaintiff's membership. The six causes of action include: (1) breach of fiduciary duty; (2) breach of AAAD by-laws; (3) breach of the Goodyear Agreement; (4) wrongful interference with contractual relations; (5) wrongful interference with prospective business opportunities; and, (6) violation of the "laws of the United States of America and the State of New York". The plaintiff seeks damages, permanent injunctive relief and attorney's fees.

Preliminarily, the Court notes that jurisdiction based on diversity is proper, since each of the parties are citizens of different states and the matter in controversy exceeds the sum or value of $50,000 (see 28 U.S.C. § 1332).

At the outset, the Court dismisses the plaintiff's claims for monetary relief as a matter of law. First, by reason of the initial TRO and the subsequent interim or temporary injunction, the plaintiff has remained a member of AAAD during the pendency of the trial and to the present time. The plaintiff has continued to service its Goodyear stores as a AAAD member and, as a result, has not suffered any monetary damages.

Although there may have been discussion at the close of the trial concerning the postponement of proof of damages, the Court now rules that there could not be any monetary damages arising from the "bad faith" involved in the secret agreement between AAAD and Motor Age. Significantly in this regard, the plaintiff has, at all times, retained its membership in AAAD and continued to serve Goodyear without interruption.

When asked by the Court what monetary damages the plaintiff is claiming, the plaintiff's counsel raised only the following issues: 1) the AAAD cancellation of the plaintiff's John Deere contract; 2) inclusion of Motor Age in AAAD; 3) additional discounts made to Motor Age and not the plaintiff; 4) AAAD steering jobber leads to Motor Age rather than the plaintiff; and, 5) attorney fees.

The Court finds that none of these alleged theories of damages are viable. In fact, counsel for the plaintiff conceded that there are no damages in the event that the Court finds that the plaintiff would be enti-

tled only to an injunction directing reinstatement of its membership, as follows:

"MR. FRANK: Under your Honor's hypothetical—I would submit that, under those limits, you had circumstances we would not be entitled to damages, other than an injunction for restoration, and of course the plaintiff would ask at that time for an affirmative prohibition against any type of retaliatory action."

■ The Court also rejects the plaintiff's claim for attorney's fees. It is well settled that absent an agreement, statute or court rule, under our present judicial system, under the "American Rule" such attorney's fees are not available (*see Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492, 548 N.E.2d 903, 904, 549 N.Y.S.2d 365, 366 [1989]). The plaintiff has not provided the Court with any such agreement or statute, nor has the Court independently been able to find any authority justifying such an award under these circumstances (*cf. Lewis v. S.L. & E., Inc.*, 629 F.2d 764, 773 [2d Cir.1980] [district court erred in entering award of attorney's fees absent agreement or statute]).

Accordingly, assuming that the plaintiff is successful on the merits of any cause of action, the only relief properly available at this time is reinstatement as a member of AAAD pursuant to the terms of a permanent injunction. Specifically, as to injunctive relief, the plaintiff seeks: (1) reinstatement as a member of AAAD; and, (2) termination of Motor Age's membership. The Court now turns to the applicable substantive law underlying the causes of action in the complaint to determine whether the plaintiff has established any of the six causes, and if so, whether an injunction should issue.

For the reasons that follow, the Court finds that the plaintiff has succeeded on the merits of the second cause of action, namely, breach of the AAAD by-laws. As to the remaining five causes of action, the Court finds that they are either without merit as a matter of law, or that the plaintiff has failed to sustain its burden of proof.

Accordingly, the five causes of action that are dismissed are initially reviewed, followed by a discussion of the second cause of action and the applicable standard for a permanent injunction.

1. Breach of Fiduciary Duty.

■ With respect to the first cause of action, the parties agree, and the Court finds, that Illinois, rather than New York law applies (*see First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 [1983]; *Treco, Inc. v. Land of Lincoln Sav. & Loan*, 749 F.2d 374, 377 [7th Cir.1984]). In any event, as to the elements of a fiduciary relationship, the laws of the two states apparently do not differ (*see Sound Video Unlimited, Inc. v. Video Shack Inc.*, 700 F.Supp. 127, 133 [S.D.N.Y.1988]).

Under the law of Illinois, a fiduciary relationship arises between parties when one reposes trust and confidence in another, and the latter achieves substantial dominance and influence over the actions of the former (*see In re Estate of Shedrick*, 122 Ill.App.3d 861, 866, 78 Ill.Dec. 462, 466, 462 N.E.2d 581, 585 [1st Dist.1984]). The existence of such a relationship "must be shown by proof so clear and convincing, so strong, unequivocal and unmistaken that it leads to only one conclusion" (*Carey Elec. Contracting, Inc. v. First Nat'l Bank*, 74 Ill.App.3d 233, 237–38, 30 Ill.Dec. 104, 108, 392 N.E.2d 759, 763 [2d Dist.1979]; *see also Maguire v. Holcomb*, 169 Ill.App.3d 238, 242, 119 Ill.Dec. 932, 934, 523 N.E.2d 688, 690 [5th Dist.], *appeal denied*, 122 Ill.2d 577, 125 Ill.Dec. 220, 530 N.E.2d 248 [1988]). Whether there is a fiduciary relationship is a question of fact, not law (*see BA Mortgage & Int'l Realty Corp. v. American Nat'l Bank & Trust Co.*, 706 F.Supp. 1364, 1372 [N.D.Ill.1989], *citing In re Estate of Wernick*, 151 Ill.App.3d 234, 244, 104 Ill.Dec. 486, 493, 502 N.E.2d 1146, 1153 [1st Dist.1986], *aff'd in part, rev'd in part*, 127 Ill.2d 61, 129 Ill.Dec. 111, 535 N.E.2d 876 [1989]).

The Court finds here that the plaintiff failed to establish by clear and convincing

proof that there exists a fiduciary relationship between AAAD and its members. The plaintiff concededly entered AAAD for business purposes. No proof was adduced at trial showing that the plaintiff may have been a "servient" party in the relationship or that AAAD exercised substantial dominion or control over the plaintiff's day-to-day business operations or decisionmaking. Rather, the proof shows that the plaintiff independently made all necessary business decisions and did not "blindly obey" AAAD's orders.

A slightly dominant business position by one of the parties over the other does not, by itself, operate to convert an ordinary business relationship or contractual arrangement into a confidential or fiduciary relationship (*see Carey Elec. Contracting, Inc. v. First Nat'l Bank, supra*, 74 Ill. App.3d at p. 238, 30 Ill.Dec. at pp. 108–09, 392 N.E.2d at pp. 763–64 ["[a] confidential relationship only goes to a situation where one party, because of some close relationship, relies very heavily on the judgment of the other"]).

The Court finds that AAAD did not dominate or influence the actions of the plaintiff. The only actions AAAD had "control" over, if any, are those which the plaintiff obligated itself contractually to do, namely, comply with the membership standards, which included participation and development in the Parts Plus marketing program. Clearly, under such circumstances, there is an interdependence between the parties, rather than one achieving substantial dominance, influence or control over the other. The plaintiff has shown nothing more than the usual contractual business relationship between a trade organization and a member, not a confidential or fiduciary relationship (*see Seaboard Seed Co. v. Benis Co., Inc.* 632 F.Supp. 1133, 1136–37 [N.D.Ill. 1986]).

The plaintiff has failed to prove that there was a fiduciary relationship between AAAD and the plaintiff-member. Instead, the proof submitted at trial amply supports a finding that the plaintiff was acting as an independent party in its business relations with AAAD (*see Zeilenga v. Stelle Indus., Inc.*, 52 Ill.App.3d 753, 757, 10 Ill.Dec. 581, 584, 367 N.E.2d 1347, 1350 [4th Dist.1977] [no fiduciary relationship existed between not-for-profit manufacturing concern and its members, since plaintiff acted as independent rather than servient party]).

Accordingly, the first cause of action is dismissed.

**2. Breach of the Goodyear Contract.**

■ The third cause of action in the plaintiff's complaint alleges that AAAD breached the April 22, 1985 contract, regarding the servicing of Goodyear company-owned stores in the New York-metropolitan area.[1] The parties agree that as to this cause of action, pursuant to the Goodyear Agreement, Tennessee law governs.

Under the law of Tennessee, the essential elements of a breach of contract claim are the existence of a contract, breach of that contract, and injuries or damages proximately caused by the breach (*see Tedder v. Raskin*, 728 S.W.2d 343, 351 [Tenn. App.1987]). Since there is no dispute as to the existence of a valid contract, the issues are whether there has been a breach, and if so, whether the plaintiff has suffered damages.

Without reaching the issue of whether there has been a breach, the Court finds that there are no damages, since the plaintiff was permitted to continue to service the Goodyear account. Accordingly, the third cause of action is dismissed.

**3. Interference with Contractual Rights/Benefits.**

The plaintiff's fourth cause of action, to be determined under New York law as the parties have agreed,[2] is based upon a theory of wrongful or tortious interference

---

**1.** Motor Age is not a party to the April 22, 1985 contract.

**2.** The plaintiff alleges that New York law applies to the fourth cause of action. The defendants contend that New York and Illinois law are the same, and therefore it does not matter which state's law is applied by the Court. Accordingly, the Court applies the law of the forum state.

with contractual relations. Although not clear from the plaintiff's submissions, the Court agrees with the defendants' interpretation that the claim stems from either the by-laws and/or the Goodyear Agreement.

Under New York law, it is well settled that in order to prevail on a claim for tortious interference with contractual relations, the following elements must be proven: (1) the existence of a valid contract between the plaintiff and a third party; (2) knowledge of the contract on the part of the defendant; (3) the defendant's intentional procurement of a breach of the contract by the third party; and, (4) resultant damages caused by the breach (*see Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 797 F.2d 70, 75 [2d Cir.], *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 [1986]; *Pennsylvania Engineering Corp v. Islip Resource Recovery Agency,* 710 F.Supp. 456, 464 [E.D.N.Y.1989]; *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 120, 134 N.E.2d 97, 99, 151 N.Y.S.2d 1, 5 [1956]; *Giannelli v. St. Vincent's Hosp.,* App.Div., 553 N.Y.S.2d 677, 681 [1st Dep't 1990]; *see generally* 2 F. Harper, F. James & O. Gray, *The Law of Torts* §§ 6.5–6.10 [2d ed. 1986] [overview of elements and application of the tort]).

A cause of action for tortious interference with contractual relations does not lie, however, if the contract is one terminable at will (*see Kaminski v. United Parcel Serv.,* 120 A.D.2d 409, 501 N.Y.S.2d 871 [1st Dep't 1986]), unless there is a showing of fraud, misrepresentation, unfair conduct or other wrongful acts (*see Koeppel v. Schroder,* 122 A.D.2d 780, 505 N.Y.S.2d 666 [2d Dep't 1986]; *see generally* 72 N.Y. Jur.2d, *Interference* § 9 [1988 & Supp. 1990] [collecting cases]).

■ As to the defendant AAAD, it is a party to both the by-laws and the Goodyear Agreement. Accordingly, the claim against AAAD is legally insufficient and fails as a matter of law, since it is well settled that such a claim may not be asserted against a party to the contract (*see Payne v. Kathryn Beich & Nestle,* 697 F.Supp. 612, 615–16 [E.D.N.Y.1988] [citing cases]). Put simply, AAAD cannot be held

liable for inducing the breach of a contract to which it is a party (*see Murphy v. Capone,* 120 A.D.2d 714, 502 N.Y.S.2d 511 [2d Dep't 1986]; *see also Koret, Inc. v. Christian Dior, S.A.,* App.Div., 554 N.Y.S.2d 867, 869 [1st Dep't 1990] ["[i]t is well established that only a stranger to a contract, such as a third party, can be held liable for tortious interference with a contract"]).

The claim against Motor Age, however, requires a more detailed analysis with respect to both the Goodyear Agreement and the by-laws.

■ As to the Goodyear Agreement, as noted above, the Court finds that this was a valid contract between the plaintiff and AAAD, and that it is properly characterized as a contract terminable at will upon notice. Although generally such an at-will contract would bar recovery under this theory (*see Kaminski v. United Parcel Serv., supra*), the Court finds here that as a result of the wrongful acts and bad faith of Motor Age, there was attempt to intentionally interfere or procure the breach of the contract so as to bring even an at-will contract within the ambit of this tort (*compare Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 406 N.E.2d 445, 428 N.Y.S.2d 628 [1980] [absent proof of wrongful conduct, no liability exists for the alleged interference with exclusive distributorship contract terminable at will]). In sum, the Court finds that Motor Age was aware of the existence of this contract and that Motor Age intentionally attempted to procure its breach.

Notwithstanding the proof of the first three essential elements, the plaintiff's claim must be dismissed for failure to prove the fourth, namely, that the plaintiff has sustained damages as a result of the interference. The absence of damages, of course, is fatal to the success of this cause of action (*see Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 709 F.Supp. 438, 453 [S.D.N.Y.1989]). As stated by the New York Court of Appeals in *Simon v. Noma Elec. Corp.,* 293 N.Y. 171, 177, 56 N.E.2d 537, 539 (1944), "to recover on the cause of action for wrongful interference ... plaintiff had to prove damages result-

ing from that interference". To the extent that the plaintiff relies on the attorney's fees it incurred as part of the damages, the Court finds no applicable exception to the general rule that attorney's fees are not recoverable as damages (*see, e.g., Goldberg v. Mallinckrodt*, 792 F.2d 305, 309 [2d Cir. 1986] [exception applies where party's wrongdoing exposes another to litigation with a third party, in which first party is not involved]).

Accordingly, the fourth cause of action is dismissed as against both defendants.

### 4. Interference With Business Opportunities.

■ The fifth cause of action alleges prospective interference with the plaintiff's business opportunities. The parties agree that New York law governs.

The Second Circuit summarized this tort under New York law, as follows:

> "In order to prevail on a claim of tortious interference with prospective economic advantage, a plaintiff is required to show 'the defendant's interference with business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff *or* by means that are "dishonest, unfair or in any other way improper."' ... If the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct."

*PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 269 (2d Cir.1987) (citations omitted); *see also Lerman v. Medical Assocs. of Woodhull, P.C.*, App. Div., 554 N.Y.S.2d 272, 273 (2d Dep't 1990).

Additionally, the tort "usually involves interference with a 'business relationship not amounting to a contract'" (*PPX Enters., Inc. v. Audiofidelity Enters., Inc., supra*, 818 F.2d at p. 270, *quoting* 32 N.Y. Jur., *Interference* § 40 [1963]), and involves either a severance or injury to that relationship (*see id.*).

Presumably, the relationship which is the subject of the claim as against AAAD, is between the plaintiff and Goodyear. This relationship arises solely out of the contract between the plaintiff and AAAD over the servicing of the Goodyear account. The plaintiff has not adduced proof showing that Motor Age's "sole motive was to inflict injury". However, the plaintiff has established that Motor Age employed unfair, and improper means to interfere with plaintiff's advantageous business relationship with Goodyear (*see e.g. Nifty Goods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 838 [2d Cir.1980]). Nevertheless, similar to the discussion concerning the fourth cause of action sounding in wrongful interference with contract, the plaintiff failed to establish any damages.

Based upon the foregoing, the fifth cause of action is dismissed.

### 5. Violation of "The Laws of The United States and The State of New York".

The plaintiff's all-encompassing sixth cause of action includes allegations of unlawful and unfair trade practices in violation of both federal and state law. Although not specified in the plaintiff's papers or during the course of trial until the last day, it appears that the claim is based on the alleged violations of section 1 of the Sherman Act, 15 U.S.C. § 1, and New York's counterpart antitrust law, the Donnelly Act, N.Y.Gen.Bus.Law § 340.

Not only has the plaintiff failed to allege the requisite elements of this cause of action under either the Sherman Act or the Donnelly Act, but the evidence adduced by the plaintiff does not establish any price fixing whatsoever.

■ As to the Sherman Act, nothing was offered to prove the existence of a conspiracy among competitors to fix prices with respect to certain goods (*see International Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793 [2d Cir. 1987]). The proof required to sustain such a claim includes, *inter alia*, evidence of a relevant product and geographic market, reduction of that market by reason of the conspiracy, and an anti-competitive effect outweighing any pro-competitive benefits (*see International Distribution Centers,*

*Inc. v. Walsh Trucking Co., supra,* 812 F.2d at pp. 793–95; *see also United States Football League v. National Football League,* 842 F.2d 1335, 1360 [2d Cir.1988]). No such proof was offered here.

■ To the extent that the plaintiff attempts to state a claim under the Donnelly Act, it is also deficient, since section 340 of the Donnelly Act is patterned after section 1 of the Sherman Act and its application is governed under the same standards as those developed under the Sherman Act (*see, e.g., Empire Volkswagen, Inc. v. World–Wide Volkswagen Corp.,* 814 F.2d 90, 98 n. 4 [2d Cir.1987], *citing Hsing Chow v. Union Central Life Ins. Co.,* 457 F.Supp. 1303, 1308 [E.D.N.Y.1978]). Accordingly. the plaintiff's failure to establish a Sherman Act violation is equally fatal to its Donnelly Act claim. Therefore, the sixth cause of action is dismissed in its entirety.

6. Breach of AAAD By-laws.

Having dismissed five of the six causes of action, the Court now turns to the remaining cause of action; namely, the second cause alleging breach of the membership by-laws by AAAD. As to this cause of action, the parties dispute what state law governs. The plaintiff contends that Illinois law applies; AAAD argues that New York law should control. Thus, a threshold consideration for the Court is to determine this conflicts of law issue.

■ A federal district court adjudicating a diversity action is required to apply the choice of law rules of the forum state within which the court sits (*see Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 [1941]). However, the Court need only apply choice of law rules where there is a "true conflict" (*see Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 838, 105 S.Ct. 2965, 2988, 86 L.Ed.2d 628 [1985]; *Norlin Corp. v. Rooney, Pace, Inc.,* 744 F.2d 255, 263–64 [2d Cir.1984]). Otherwise, the controversy is considered a "neutral" case, and the Court is free to apply the law of either one of the states involved.

■ It appears that both New York and Illinois law are substantially the same with respect to the key issue of the standard of judicial review with regard to the termination or expulsion of members from a private association (*compare Purpura v. Richmond County Country Club,* 114 A.D.2d 460, 461, 494 N.Y.S.2d 371, 372 [2d Dep't 1985] [New York law], *with Dannhausen v. Business Publications Audit of Circulation, Inc.,* 797 F.2d 548, 551 [7th Cir.1986] [Illinois law]). In both states, the courts are generally reluctant to take a role in dispute resolution between a private, voluntary association and its members, with, however, certain limited exceptions such as bad faith, bias or other wrongful conduct. Applying the law of either state, the Court finds that the plaintiff has sustained its difficult burden proving "bad faith" on the part of AAAD and Motor Age so as to establish its cause of action for breach of the by-laws and that judicial intervention is warranted.

■ The by-laws of AAAD are an agreement between the association and its members. On this subject, in *Bowman v. Armour & Co.,* 17 Ill.2d 43, 46, 160 N.E.2d 753, 755 (1959) the Supreme Court of Illinois held as follows:

"The charter or articles of incorporation of an Illinois corporation is a contract of a three-fold nature. It is operative as between the corporation and the State and it creates rights and duties as between the corporation and its shareholders, as well as between the shareholders themselves" (citations omitted).

The threshold consideration for the Court's determination is whether the Court may properly intervene at all in this dispute. Traditionally, the courts relied upon contract, property or tort theories to justify judicial intervention in disputes arising between a private association and its members (*see generally Developments in the Law—Judicial Control of Actions of Private Associations,* 76 Harv.L.Rev. 983, 998–1005 [1963] [summarizing various theories]). This approach has changed in favor of judicial review of an association's disciplinary proceedings only where a member's

expulsion, technically in strict compliance with the association's by-laws, is influenced by bias, prejudice or lack of good faith (*see Illinois Supreme Court Review—Judicial Reinstatement of Members Expelled From Voluntary Associations*, 67 Nw.U. L.Rev. 659, 746–54 [1972]; *see generally* Annotation, *Propriety of Suspension or Expulsion From Trade Association*, 72 A.L.R.3d 422 [1976 & Supp.1990] [collecting cases]).

Under Illinois law, "[a] court will not review the actions of a voluntary association with respect to its members; when a court does intervene, however, the scope of its intervention is exceedingly narrow" (*National Ass'n of Sporting Goods Wholesalers, Inc. v. F.T.L. Mktg. Corp.*, 779 F.2d 1281, 1285 [7th Cir.1985]). Accordingly, "judicial inquiry into the affairs of private, voluntary associations is limited to the question of whether an association has treated its members in accord with its by-laws and *rudimentary due process*" (*Dannhausen v. Business Publications, supra*, 797 F.2d at p. 551 [emphasis supplied]; *see also Virgin v. American College of Surgeons*, 42 Ill.App.2d 352, 368–71, 192 N.E.2d 414, 422–24 [1st Dist.1963]), such as when the association acts in "bad faith" in expelling a member (*see Illinois Supreme Court Review—Judicial Reinstatement, supra*, 67 Nw.U.L.Rev. at p. 754).

In the leading case of *Van Daele v. Vinci*, 51 Ill.2d 389, 282 N.E.2d 728, *cert. denied sub nom. Certified Grocers of Ill., Inc. v. Sparkle Feed Center, Inc.*, 409 U.S. 1007, 93 S.Ct. 438, 34 L.Ed.2d 300 (1972), the Supreme Court of Illinois granted injunctive relief in the form of reinstatement to a member of a voluntary retail grocers' association, where the association's disciplinary procedure deprived the member of basic, "rudimentary" due process because of the existence of bias and bad faith accompanying the termination process. In *Van Daele*, the applicable rule was clearly set forth, as follows:

"We agree 'that a private organization, particularly if tinged with public stature or purpose, may not expel or discipline a member adversely affecting substantial property, contract or other economic rights, except as a result of fair proceedings which may be provided for in organization by-laws, carried forward in an atmosphere of good faith and fair play' (*McCune v. Wilson* (Fla.1970), 237 So.2d 169, 173.)" (*Id.* at p. 394, 282 N.E.2d at p. 732).

The Court reasoned in *Van Daele* that blind adherence to the association's by-laws with respect to the disciplinary procedure does not insulate the actions from judicial review if the action itself was undertaken in bad faith. This decision directly followed the established principle that courts should not intervene in the affairs of private associations, absent a showing of bad faith or bias.

New York law is in accord with the *Van Daele* holding to the extent that mere procedural compliance with the disciplinary process does not insulate the termination process from judicial scrutiny if it was tainted by bad faith or wrongful, corrupt conduct (*see, e.g., Purpura v. Richmond County Country Club, supra*, 114 A.D.2d at p. 461, 494 N.Y.S.2d at p. 372 [1985] ["judicial review ... is unavailable, unless the reason for expulsion is ... so trivial as to suggest that the action of the association was capricious or corrupt, or unless the association failed to administer its own rules fairly"]).

The rule in New York was also stated in *Matter of Northrup v. Kirwan*, 88 Misc.2d 255, 263, 387 N.Y.S.2d 221, 227 (Sup.Ct. Monroe County 1976), *aff'd*, 57 A.D.2d 699, 395 N.Y.S.2d 389 (4th Dep't 1977), as follows:

"we are met at the threshold with the prevailing rule that courts are reluctant to interfere with the internal affairs of an association as long as its procedures do not violate standards of fair dealing" (citations omitted).

Moreover, as set forth in *Bernstein v. The Players*, 120 Misc.2d 998, 1001, 466 N.Y.S.2d 897, 899 (Sup.Ct. N.Y. County 1983), in reviewing the decision of a voluntary association under the standard set forth above, the Court may not consider

whether it would have arrived at the same conclusion. Rather such decision is subject to review, only as follows:

"Where a private club or association hears and decides an internal dispute, the courts will not review the determination unless there is a showing that the hearing was in bad faith or basically unfair or that the determination was fraudulent or was utterly unsupported by any evidence. *Madden v. Atkins,* 4 N.Y.2d 283, 297, 174 N.Y.S.2d 633, 151 N.E.2d 73 (1958) (concurring opinion of Judge Desmond); *People ex rel. Johnson v. N.Y. Produce Exchange,* 149 N.Y. 401, 44 N.E. 84 (1896); *see also Fittipaldi v. Legassie,* 7 A.D.2d 521, 525, 184 N.Y.S.2d 226 (4th Dept.1959)."

As set forth in great detail above, the evidence presented at trial shows that as to the procedural requirements of the disciplinary process itself, AAAD properly terminated the plaintiff's membership. With the assistance of MRI, the plaintiff developed an initial Parts Plus program in October of 1985. As of 1986, it is apparent that the plaintiff's Parts Plus program declined. Significantly, in March of 1987, the plaintiff's efforts and overall performance was considered deficient under the AAAD membership standards, of which the plaintiff was well aware. By the close of 1987, AAAD effectively had no Parts Plus program in place. In May of 1988, representatives of the Standards Committee met with the plaintiff, as well as other members who were performing poorly, to discuss the implementation of an effective program for the upcoming year. The proof shows that little progress followed.

By early 1989, the plaintiff had three Parts Plus jobbers, one less than it had in May of 1988. Concededly, however, the New York metropolitan area is a very competitive and difficult marketplace to implement such a program. However, in 1989, a real effort was made by the plaintiff to improve its Parts Plus program. It placed the Parts Plus logo on its building, its trucks and in its phone answering. Significantly, it increased its Parts Plus jobbers by six in mid–1989.

The Standards Committee thereafter made a recommendation to the Executive Committee to consider termination of the plaintiff's membership. A hearing was conducted, at which time the plaintiff claimed it complied with the Parts Plus program, and in fact invited AAAD to do an independent evaluation. AAAD accepted the invitation and conducted an investigation of the plaintiff's jobbers, which, according to the report prepared by Joe Matlock, revealed that they were unaware of the plaintiff's participation in the Parts Plus program. The Executive Committee thereafter held a second hearing on November 16, 1989, at which time, allegedly because of the plaintiff's failure to commit to AAAD programs, the Association decided that it was in the best interests of the Association that the plaintiff's membership be terminated.

In reviewing the plaintiff's Parts Plus performance in 1989, acting with reasonable prudence, the AAAD Executive Committee could have decided that the plaintiff did demonstrate "a sincere interest to be a bona fide, active and participating member of the Association" and have voted to retain the plaintiff as a member. On the other hand, taking into consideration the plaintiff's poor performance during the years 1987 and 1988, notwithstanding the improvement in 1989, the same reasonably prudent Executive Committee could have decided that the plaintiff still lacked the commitment referred to in the by-laws, and voted to expel the plaintiff. In the absence of bad faith, this Court would not have interfered with either decision.

In sum, the Court finds that AAAD substantially complied with the disciplinary or termination process set forth in the Association's by-laws. Absent bad faith or bias, this Court would not intervene in the dispute or review the determination of AAAD to expel the plaintiff. Any technical violation raised by the plaintiff would not, standing alone, warrant judicial intervention. It is the proper policy of the Court to refrain from unnecessarily interfering in the internal affairs of a private, not-for-

profit trade association, which is governed by by-laws.

However, where, as here, the disciplinary process is tainted by bad faith, the Court has not only the power but the duty to exercise its equitable powers to intervene at the behest of an expelled member. Even if there is a facially proper basis for the termination of the member, the process is not insulated from judicial scrutiny if it was stained by bad faith.

As set forth above in stark detail, bad faith emerged when a "secret" agreement was reached in 1987 between Motor Age and AAAD to take over the plaintiff's Goodyear accounts. Out of this clandestine and corrupt[3] "meeting of the minds" came the bad faith, which permeated the termination process.

The secret agreement was initially entered into by Paul Lehr on the part of Motor Age and Joe Matlock on the part of AAAD. Joe Matlock was the Executive Vice President of AAAD in charge of soliciting new members and was in a position to bind AAAD. Matlock was subsequently involved in almost every phase of the process that led to the admission of Motor Age and the plaintiff's termination. The initial letter application by Motor Age was sent by Lehr to Matlock (*see* Defendant's Exhibit C). A November 12, 1987 memorandum by Matlock to the members, which was on the same sheet as the ballot, stated the following:

> "... it is highly recommended that you vote favorably for the admission of Motor Age as an AAAD member" (Plaintiff's Exhibit 10).

Matlock was a member of the two-person committee that "investigated" plaintiff's Parts Plus program in 1989. Matlock wrote the final June 7, 1989 report which significantly contributed to the vote to expel the plaintiff. The last paragraph of Matlock's report reads as follows:

> "The conclusion to be drawn here is that other NY warehouses have been effective, but AESC has experienced four

years of failure to achieve Parts Plus objectives in their market."

The Court notes that Joe Matlock did not testify at this trial. Although Matlock was a key executive of AAAD until he resigned in January 1990, after this litigation commenced, no inference will be taken by the Court by reason of the failure on the part of the plaintiff to prove that Matlock, a retired AAAD employee, was still under the control of AAAD. Nevertheless, it is noted that Matlock never was produced to deny the existence of the secret agreement with Motor Age.

After the plaintiff's representatives were heard at the Executive Committee meeting on November 16, 1989 and then left the meeting, present when the termination vote was taken were Joe Matlock and Marvin Almy. Matlock not only attended this final Executive Committee meeting at which the vote to expel the plaintiff was taken, but he alone reported the negative results of the recent investigation of the plaintiff's Parts Plus jobbers.

Further, there is evidence in the record that the Legal Department of AAAD was informed of and acquiesced in the secret agreement. Garfinkle testified that:

> "Paul told me AAAD's legal department recommended at that time it wouldn't be a good idea for them to give Motor Age a program. They were waiting to build a case, I guess, against Automotive Electric for poor performance or whatever the standards of AAAD are."

In addition, attorney Johnson, counsel for AAAD personally visited only one of the six firms that were having Parts Plus problems—the plaintiff.

There is other evidence in the record of preferential treatment accorded to Motor Age at the expense of the plaintiff. Upon admission, Motor Age alone was given a special payment of $500 per jobber converted to the Parts Plus program, for a total of $42,000 paid by AAAD to Motor Age. Motor Age was permitted to purchase "Trust" labeled products from automotive parts manufacturers Premier and Arc directly

---

**3.** According to Black's Law Dictionary p. 182 (abridged 5th ed. 1983), the definition of "cor-

rupt" includes: spoiled; tainted; vitiated and morally degenerate.

without compelling Premier and Arc to pay GSA discount fees to AAAD. Thus, Motor Age was able to purchase the Premier and Arc products cheaper and could undersell the plaintiff in their competitive territories. This was a special privilege extended to Motor Age, at the plaintiff's expense. Further, notwithstanding its prior order to purchase John Deere cut-price auto parts, plaintiff's order was unilaterally cancelled by AAAD, while Motor Age was permitted to purchase these auto parts at discount, which, again, enabled Motor Age to undersell the plaintiff. In addition, after Motor Age gained membership in AAAD, the leads in the territorial areas shared by Motor Age and the plaintiff, were directed solely to Motor Age.

The bad faith emanating from the secret agreement must have influenced Matlock's actions as he guided the Executive Committee to the ultimate expulsion of the plaintiff.

The documentary evidence consisting of the fax lead sheet from Matlock to Lehr dated September 8, 1987, the Lehr memorandum dated September 10, 1987 commenting on the plaintiff's Goodyear business, and the annexed detailed financial data on the plaintiff's Goodyear stores (Plaintiff's Exhibit 38), coupled with the evasive and contradictory testimony of Paul Lehr and the forthright and believable testimony of Ted Garfinkle, furnishes clear and convincing evidence that there was a secret agreement between AAAD and Motor Age, to bring in Motor Age as a member in order for it to take over the plaintiff's Goodyear business. Given the thrust of the representations by Motor Age in its application promising not to attempt to obtain any such business and the representations by AAAD that it would not tolerate such a takeover, this secret agreement and its sequelae constituted "bad faith" on the part of both defendants.

In sum, at least as to the November 17, 1989 termination, the process was forever tainted; the bad faith so permeated the circumstances leading up to the termination as to deprive the plaintiff of even rudimentary due process. Accordingly, seldom required judicial intervention is appropriate in this case.

■ The plaintiff's success on the merits, however, is only the first step in determining whether the Court in its discretion should grant the drastic relief of a permanent injunction. The governing standard in determining whether to grant the extraordinary equitable relief of a permanent injunction is as follows: First, the plaintiff must have achieved actual success on the merits (*see Smithkline Beckman Corp. v. Proctor & Gamble Co.*, 591 F.Supp. 1229, 1235 [N.D.N.Y.1984], *aff'd without opn.*, 755 F.2d 914 [2d Cir.1985], *citing Sierra Club v. Alexander* 484 F.Supp. 455, 471 [N.D.N.Y.1980] ). Second, once having demonstrated success, permanent injunctive relief is only available when a remedy at law would be inadequate to afford complete relief (*see, e.g., New York State NOW v. Terry*, 886 F.2d 1339, 1362 [2d Cir.1989] [must show irreparable harm], *cert. denied*, — U.S. —, 110 S.Ct. 2206, 109 L.Ed.2d 532 [1990] ). Third, the balance of the equities must tip decidedly in favor of the plaintiff (*see New York State NOW v. Terry*, 704 F.Supp. 1247, 1262 [S.D.N.Y.] [citing cases], *aff'd, but modified on other grounds*, 886 F.2d 1339 [2d Cir.1989], *cert. denied*, — U.S. —, 110 S.Ct. 2206, 109 L.Ed.2d 532 [1990] ).

■ Having satisfied the first prong, namely, success on the merits, the next step is to determine whether there exists an adequate remedy at law or whether the plaintiff might suffer irreparable harm absent the issuance of an injunction. To resolve this element, the Court turns to the seminal decision by Judge Friendly in *Semmes Motor, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970) discussing irreparable harm in connection with the attempt by Ford Motor Company to terminate the family run dealership of Semmes Motor, Inc. Although in the context of a preliminary injunction, this Court finds the crisp language of certain passages especially pertinent here, where the factual setting is somewhat similar:

"Ford's contention that Semmes failed to show irreparable injury from termination

is wholly unpersuasive. Of course, Semmes' past profits would afford a basis for calculating damages for wrongful termination, and no one doubts Ford's ability to respond. But the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award."

*See also John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 29 (2d Cir.1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979).

The Court finds that absent membership in AAAD and the opportunity to service the Goodyear stores, which account for almost one-third of the plaintiff's gross sales, it may have to terminate its business. This is not a case of mere lost profits, but rather the basic existence of a seventy year old business may be threatened. The evidence reveals that in order to prepare to service the substantial Goodyear account, the plaintiff added a night shift, placed a two million dollar mortgage on their warehouse and became involved with a factor with a running balance owed of approximately $700,000. Like the plaintiffs in *Semmes*, the Judelsons have a virtually unmeasurable interest in continuing to operate their business and a damage award would, in this Court's view, be inadequate to afford complete relief. In this regard, the Court notes that the remedy of reinstatement by way of an injunction was also found appropriate in *Van Daele*.

As to the balance of hardships, the scale tips decidedly in favor of the plaintiff. There is no question that the "hardship" imposed upon AAAD in keeping the plaintiff as a member is minimal compared to the ruinous financial hardship that would ensue to the plaintiff absent such relief. Accordingly, the Court grants the plaintiff's application for a permanent injunction, based upon it having established the second cause of action.

Insofar as fashioning the ultimate remedy, the Court "has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct" (*Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 355 [2d Cir. 1983], *citing Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 951 [2d Cir.1978]).

In exercising this discretion, the Court frames the terms of the injunction as follows: the defendant AAAD is directed to reinstate the plaintiff as a full member in AAAD, entitled to the same rights and privileges as all other members in good standing. Specifically, AAAD is directed not to interfere with the plaintiff's membership in the association and/or the plaintiff's rights with regard to the Goodyear account, so long as the plaintiff is in full compliance with the provisions of the bylaws and applicable standards set forth by the Standards Committee. In this regard, the performance of the plaintiff for purposes of possible future termination, as with any other member in good standing of AAAD, is to be judged from this day forward.

The complaint is otherwise dismissed as to all of the defendants.

## CONCLUSION

For the foregoing reasons, the first, third, fourth, fifth and sixth causes of action are dismissed, as are the plaintiff's claims for damages and attorney's fees. The plaintiff's request to terminate the membership of Motor Age in AAAD is denied. Having succeeded on the merits of the second cause of action, and shown irreparable harm and a balance of the equities in its favor, the plaintiff is granted a permanent injunction as follows: AAAD is directed to reinstate the plaintiff as a full member in good standing as it was prior to the termination on November 17, 1989, entitled to the same rights, privileges and benefits of all other members in good standing who must comply with the bylaws and applicable standards set forth by the Standards Committee. The plaintiff's performance is to be judged from this date forward for purposes of future disciplinary or termination proceedings, if any, and the past activities, actions or performance of

the plaintiff upon which this decision is based, are not to be considered by AAAD.

The Clerk of the Court is directed to enter judgment in favor of the plaintiff on the second cause of action.

SO ORDERED.